UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
In re:

THE GREAT ATLANTIC & PACIFIC TEA                         **OPINION AND ORDER**
COMPANY, INC., *et al.*,

                          Reorganized Debtors.
-----------------------------------------------------------------------x
HUDSON ENERGY SERVICES, LLC,

                                        Appellant,

                                                                    12-CV-7629 (CS)
                - against -

THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC., *et al.*,

                                        Appellees.
-----------------------------------------------------------------------x

<u>Appearances</u>:

Jeremy B. Reckmeyer
Andrews Kurth LLP
New York, New York

David A. Zdunkewicz
Andrews Kurth LLP
Houston, Texas
*Counsel for Appellant*

Paul M. Basta
Ray C. Schrock
Andrew M. Genser
Hunter Murdock
Nathaniel J. Kritzer
Kirkland & Ellis LLP
New York, New York
*Counsel for Reorganized Debtors-Appellees*

Seibel, J.

Before the Court is the appeal of Hudson Energy Services, LLC ("Hudson") from the Bankruptcy Court's August 24, 2012 bench ruling and August 30, 2012 Order denying its request for administrative priority pursuant to 11 U.S.C. § 503(b)(9).  (Bankr. Docs. 3952, 3953).[1]

For the reasons that follow, the Bankruptcy Court's Order is VACATED, and the case is REMANDED to the Bankruptcy Court for further proceedings.

## I.  **BACKGROUND**

### A.  *Proceedings Below*

On April 27, 2012, Hudson filed a Motion for Allowance of Administrative Claim Pursuant to 11 U.S.C. § 503(b)(9),[2] seeking administrative priority for $875,943.90 in electricity sold to the Great Atlantic & Pacific Tea Company, Inc. and its affiliates, (collectively, the "Reorganized Debtors"), in the twenty days before the petition date.  (Bankr. Doc. 3728; *id.* Ex. A.)  On August 17, 2012, the Reorganized Debtors objected to Hudson's Motion on the basis that electricity did not qualify as "goods" under Section 503(b)(9), (*see* RD Bankr. Obj.),[3] and Hudson replied to the objection on August 22, 2012, (*see* Hudson Bankr. Reply Mem.).[4]  On

---

[1] "Bankr. Doc." refers to documents filed in the U.S. Bankruptcy Court for the Southern District of New York under docket number 12-BK-24549.

The transcript of the Bankruptcy Court's August 24, 2012 bench ruling, (Bankr. Doc. 3953), was amended on October 8, 2012, (Bankr. Doc. 3999), and on October 25, 2012, Judge Drain entered a Modified Bench Ruling that corrected typographical errors in the earlier transcripts, (Bankr. Doc. 4017).  Accordingly, when referencing the decision of the Bankruptcy Court in this Opinion, I will refer to the Modified Bench Ruling ("MBR").  (Bankr. Doc. 4017.)

[2] 11 U.S.C. § 503(b)(9) provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . [for] the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."

[3] "RD Bankr. Obj." refers to the Reorganized Debtors' Objection to Administrative Claim of Hudson Energy Services, LLC.  (Bankr. Doc. 3932.)

[4] "Hudson Bankr. Reply Mem." refers to the Reply to Reorganized Debtors' Objection to Administrative Claim of Hudson Energy Services, LLC.  (Bankr. Doc. 3942.)

August 24, 2012, the Bankruptcy Court heard oral arguments on Hudson's Motion, (Bankr.

Docs. 3953, 3999), and denied the claim from the bench following the argument, (*see* Bankr.

Docs. 3952, 4017).

B. *The Bankruptcy Court's Decision*

For the purposes of Hudson's Section 503(b)(9) claim, the Reorganized Debtors do not

dispute that Hudson sold electricity to them in the ordinary course of business within twenty

days before the bankruptcy or the amount of Hudson's claim, but rather only whether the

electricity provided by Hudson constitutes "goods" within the meaning of the statute.  (*See* MBR

3.)  In denying Hudson's Motion, the Bankruptcy Court concluded that electricity did not

"clearly fall" within the definition of "goods" in Section 503(b)(9), (*see id.* at 10), relying in part

on the principle that administrative expense claims "must be tightly construed," (*id.* at 4 (quoting

*Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006)), and "clearly fit

within the statute's provisions" before being accorded priority treatment, (*id.* at 10).  The

applicable definition of "goods," cases interpreting Section 503(b)(9) and Uniform Commercial

Code ("UCC") Article 2 as applied to electricity, and the legislative history of the Bankruptcy

Abuse Prevention and Consumer Protection Act ("BAPCPA") also informed the Bankruptcy

Court's denial of Hudson's Motion.  (*See id.* at 4-18.)

1.  Definition of "Goods"

As the term "goods" is not defined in the Bankruptcy Code, the Bankruptcy Court first

held that the UCC definition of goods[5] should apply to interpret the scope of the term in Section

---

[5] UCC Section 2-105(1) defines "goods" as "all things . . . which are movable at the time of identification to the contract for sale" except "money in which the price is to be paid, investment securities (Article 8) and things in action."  UCC § 2-105(1).  The first Official Uniform Comment, which appears in the uniform statute as well as the New York UCC, states, among other things:  "The definition of goods is based on the concept of movability and the term 'chattels personal' is not used.  It is not intended to deal with things which are not fairly identifiable as movables before the contract is performed."  *Id.* § 2-105 cmt. 1.

503(b)(9), citing the UCC's nearly nationwide adoption, the similarity of its definition to the non-legal meaning of the word, and other courts' "uniform[] agree[ment]" that the UCC provides the operative definition.  (*See id.* at 4-5 (citing *GFI Wis., Inc. v. Reedsburg Util. Comm'n* (*In re Grede Foundries, Inc.*), 440 B.R. 791, 797 (W.D. Wis. 2010); *In re Circuit City Stores, Inc.*, 416 B.R. 531, 537 (Bankr. E.D. Va. 2009); *In re Goody's Family Clothing, Inc.*, 401 B.R. 131, 134 (Bankr. D. Del. 2009).)

Despite consensus on using the UCC definition, however, the applicability of Section 503(b)(9) to the sale of electricity is an open question.  Although the majority of cases hold that electricity is a good under UCC Section 2-105(1), a strong minority – led by decisions of the New York Court of Appeals, the Second Circuit, and this Court – disagrees.  (*See id.* at 6-7.)  In the Section 503(b)(9) context, courts are in essence evenly split on whether electricity is a good – a conflict driven in part by the divergent underlying UCC case law.  *Compare In re Pilgrim's Pride Corp.*, 421 B.R. 231, 240 (Bankr. N.D. Tex. 2009) ("The Electricity Provider does not clearly fit within the requirements of [S]ection 503(b)(9). . . . The Electricity Provider's [S]ection 503(b)(9) claim must therefore be denied administrative priority under [S]ection 503(b)(9)."); *In re Samaritan Alliance, LLC*, No. 07-BK-50735, 2008 WL 2520107, at *4 (Bankr. E.D. Ky. June 20, 2008) ("[T]he court concludes that while courts are divided on the general question of whether or not electricity is 'goods,' the court agrees with the Debtor that [S]ection 503(b)(9) is not applicable here and that the electricity provided is more properly characterized as a 'service.'"), *with In re Grede Foundries*, 440 B.R. at 799 ("[T]he bankruptcy court ruled correctly that electricity is a 'good' within the meaning of [Section] 503(b)(9) of the Code."); *In*

---

The Bankruptcy Court also relied on UCC Section 2-105(4), which states that "[a]n undivided share in an identified bulk of fungible goods is sufficiently identified to be sold although the quantity of the bulk is not determined.  Any agreed proportion of such a bulk or any quantity thereof agreed upon by number, weight or other measure may to the extent of the seller's interest in the bulk be sold to the buyer who then becomes an owner in common."  *Id.* § 2-105(4).

*re Erving Indus., Inc.*, 432 B.R. 354, 374 (Bankr. D. Mass. 2010) ("Having determined that the only question is whether electricity, as supplied by [claimant], is a good under [Section] 503(b)(9), this Court concludes that, using either the UCC definition or the definition urged by the Debtor, electricity easily falls within the definition.").

Relying on New York's interpretation of "goods," *see Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 163 F.3d 153, 155 (2d Cir. 1998) ("[T]he UCC does not apply to [the] sale of electricity which is a service under New York law."), the Reorganized Debtors argued below that New York's interpretation of the UCC should govern when assessing the applicability of Section 503(b)(9) to electricity – an assertion rejected by the Bankruptcy Court in favor of a uniform federal definition.  (*See* MBR 6-9.)  Although courts have looked to state law on occasion to determine a bankruptcy law right, the Bankruptcy Court ultimately determined that Section 503(b)(9) requires a "uniform-throughout-the-country analysis."  (*Id.* at 9 (citing *In re Erving Indus.*, 432 B.R. at 366 n.23 ("The Court remains mindful, however, that [Section] 503(b)(9) is federal law. . . . [T]o the extent that differences arise from local enactments of the UCC or the variances in its interpretation by the courts of the states, . . . federal bankruptcy courts should be reluctant to give those variances effect under federal law.") (internal quotation marks omitted)).)  It further held that the principles that "administrative expense claims need to be construed narrowly rather than broadly" and that a claim "should clearly fit within the statute's provisions or definition before it is accorded administrative expense treatment" are necessarily included in this federal interpretation of Section 503(b)(9).  (*Id.* at 9-10.)

In applying the UCC definition of goods to electricity, the Bankruptcy Court ultimately concluded that the term is "ambiguous when applied to electricity," (*id.* at 15), acknowledging

that other courts have reached the opposite conclusion based on similar analyses, (*see id.* at 10-

15).  That electricity is movable and measurable, can be felt, and is commonly recognized as a

commodity underscore the conclusions of the courts that find that electricity is a good for

purposes of Section 503(b)(9), (*see id.* at 12-13) – all propositions with which the Bankruptcy

Court agreed.  In particular, the Bankruptcy Court praised *Erving* as "the best analysis of th[e]

view" that electricity qualified as a good under Section 503(b)(9).[6]  (*Id.* at 13.)  Still, the

Bankruptcy Court found that "one can make a very good case, as have the New York courts

relied upon by the debtor as well as the two bankruptcy court cases that I've cited, that electricity

does not fall within the UCC definition."[7]  (*Id.* at 14.)  In particular, the Bankruptcy Court found

that electricity is not an item that is "movable at the time of identification to the contract," UCC

§ 2-105(1), because "[electricity] is not identifiable until the moment it reaches the meter, and at

that point it is used.  So it is hard to see that it is actually movable at the time of identification.

It, in essence, disappears into use at that moment," (MBR 14).  Nor, in the Bankruptcy Court's

view, does electricity satisfy the UCC's definition of an "identified bulk of fungible goods,"

UCC § 2-105(4), because "[i]t is simply a stream of electrical energy . . . identified, again, at the

point of delivery" – at the moment the contract is performed, (MBR 14).  In response to the

electricity's status as a commodity – an argument other courts have found persuasive – that fact

did not unambiguously make electricity a good in the view of the Bankruptcy Court because

---

[6] Hudson is a "non-utility supplier of electricity" that "does not perform delivery service."  (Brief of Appellant Hudson Energy Services, L.L.C. ("Hudson Mem."), (Doc. 4), 3.)  It "contracts with an electricity generator to buy specific quantities of electricity on the wholesale market, and sells that electricity to customers."  (*Id.*)  The Bankruptcy Court acknowledged that the *Erving* Court's holding that electricity qualified as a good for Section 503(b)(9) was informed by the claimant's role there as merely a seller that bought electricity from the generating utility and delivered it to the debtor – as Hudson does here.  (*See* MBR 14.)  Unlike the *Erving* Court, however, the Bankruptcy Court viewed Hudson's business model as reflective of general electric industry deregulation and not dispositive of whether the UCC definition of "goods" includes electricity.  (*See id.*)

[7] *In re Pilgrim's Pride Corp.*, 421 B.R. 231, and *In re Samaritan Alliance, LLC*, 2008 WL 2520107, are the two bankruptcy cases to which the Bankruptcy Court was referring.

"that something can be bought and sold does not necessarily mean that it fits the definitions" in the UCC. (*Id.* at 15.)

    2.  <u>Legislative History</u>

Because the term "goods" in Section 503(b)(9) was ambiguous when applied to electricity, the Bankruptcy Court turned to the statute's legislative history for guidance. In 2005, Congress enacted Section 503(b)(9) as part of the BAPCPA along with modifications to the Bankruptcy Code's reclamation provisions.[8] (*See id.* at 2, 16.) The Bankruptcy Court characterized the BAPCPA as "unprecedented in preferring vend[o]rs of goods over other prepetition creditors," noting that "[t]he rationale behind granting this form of preference has also been recognized . . . to discourage stockpiling by a debtor or an entity in financial trouble prepetition, which would further skew its supply relationships and its management of its cash." (*Id.* at 15-16 (citing *In re Samaritan Alliance*, 2008 WL 2520107, at *3-4).) Because a debtor cannot stockpile electricity, the Bankruptcy Court found that this notion highlighted that electricity did not fit cleanly within the UCC's definition of goods because electricity is "only identified at the very moment of delivery because it is then used." (*Id.* at 16.)

Considering this legislative history, the Bankruptcy Court found that it was "more likely than not," or at a minimum at least as likely, that Congress intended Section 503(b)(9) not to apply to something "evanescent" like electricity but instead to "tangible thing[s]" that can be identified before the contract is performed in a moveable and measurable quantity. (*Id.* at 16-17.) Considered alongside the principle that administrative priorities should be construed

---

[8] Specifically, 11 U.S.C. § 546(c)(1) provides that "the rights and powers of the trustee . . . are subject to the right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, within 45 days before the date of the commencement of a case under this title." The Bankruptcy Court clarified that Section 503(b)(9) and Section 546(c) "do not cross-reference each other" and "provide[] a separate and independent right," although they were considered together in the 2005 amendments. (MBR 16.)

narrowly, the Bankruptcy Court held that it should "err on not granting the administrative expense," concluding that Section 503(b)(9) "should not be construed . . . broadly to equate a sale of electricity with a 'good.'"  (*Id.* at 17.)

    3.  <u>Appeal</u>

On September 10, 2012, Hudson filed a timely Notice of Appeal.  (Doc. 1.)  On appeal, Hudson argues that the Bankruptcy Court erred in finding that electricity is not a good within the meaning of Section 503(b)(9).  (*See* Hudson Mem. 1.)  Specifically, Hudson asserts that the Bankruptcy Court erred in strictly construing Section 509(b)(3) so that electricity must "clearly fall" within the definition of "goods" to allow an administrative expense; relying on Article 2 of the UCC as the definition of "goods" for Section 509(b)(3); interpreting the first comment to the UCC Section 2-105 to require that electricity must be fairly identifiable as movable before the contract is performed to qualify as a "good" for Section 509(b)(3); finding that the electricity Hudson sold to the Reorganized Debtors was not fairly identifiable as movable before the contract was performed; and failing to hear evidence on whether the electricity Hudson provided could be fairly identified as moveable before the contract was performed.  (*See id.* at 1-2.)

The Reorganized Debtors respond that the Bankruptcy Court did not err in holding that electricity is not unambiguously a "good" within the meaning of Section 503(b)(9) because the meaning of the term is not defined in the Bankruptcy Code or settled in the common law, and the Supreme Court has held that administrative priorities must be tightly construed.  (*See* RD Mem. 1.)[9]  Moreover, the Reorganized Debtors contend that this Court should not remand this case for an evidentiary hearing because Hudson neither proffered evidence nor requested an evidentiary hearing below.  (*See id.*)

---

[9] "RD Mem." refers to Brief of Reorganized Debtors-Appellees.  (Doc. 9.)

## II.  DISCUSSION

### A.  *Legal Standard*

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) to hear appeals from final judgments, orders, and decrees of a bankruptcy court.  A district court reviews a bankruptcy court's findings of fact for clear error and reviews its legal conclusions *de novo.  Overbaugh v. Household Bank N.A.* (*In re Overbaugh*), 559 F.3d 125, 129 (2d Cir. 2009) (per curiam); *see* Fed. R. Bankr. P. 8013 (district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree," and "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous").  "Mixed questions of fact and law are subject to *de novo* review."  *Babitt v. Vebeliunas* (*In re Vebeliunas*), 332 F.3d 85, 90 (2d Cir. 2003); *see Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.* (*In re Parmalat*), 639 F.3d 572, 580 (2d Cir. 2011).

A Bankruptcy Court's determination that a payment is or is not a proper administrative expense presents a question of law.  *In re Bethlehem Steel Corp.*, 479 F.3d 167, 172 (2d Cir. 2007); *see In re Grede Foundries*, 440 B.R. at 797 (whether electricity is a good under Section 503(b)(9) is a question of law).  But, as the discussion below makes clear, the same result would obtain if I regarded the issue as a mixed one of law and fact, which is also reviewed *de novo*, or if I regarded the Bankruptcy Court's conclusion that electricity cannot be identified while moving (as required under the UCC definition of a "good") as a clearly erroneous factual determination.  *See In re Ahead Commc'ns Sys., Inc.*, 395 B.R. 512, 517 n.7 (D. Conn. 2008) (addressing legal conclusions of Bankruptcy Court *de novo* but noting that result would be the same if reviewing for abuse of discretion because finding facts with insufficient basis amounts to

clear error); *see also In re Grede Foundries*, 440 B.R. at 797 (whether electricity moving when metered is question of fact).

    *B.  Applicability of UCC Section 2-105*

        As a threshold matter, Hudson argues that the Bankruptcy Court erred in looking to the UCC definition of goods to interpret Section 503(b)(9), asserting that the Court should have considered the general common law definition of "goods," which Hudson proposes could be found in *Black's Law Dictionary*.[10]  (*See* Hudson Mem. 13-15.)  I am persuaded, however, that "it is hardly plausible that Congress expected [] judges to roll up their sleeves and set to work re-inventing the proverbial wheel and divining a more amorphous 'common understanding' of the term [goods]" – given the "wide usage and acceptance of the definition of goods found in the UCC at [Section] 2-105(1)."  *In re Erving Indus.*, 432 B.R. at 365 (emphasis omitted).  The Bankruptcy Court – as well as the numerous other courts that have reached the same conclusion on this issue – did not err in holding that UCC Section 2-105(1) should provide the definition of "goods" for the purpose of interpreting Section 503(b)(9).  *See In re Grede Foundries*, 440 B.R. at 797 ("Every bankruptcy court to consider the issue, including the court below, has applied the Uniform Commercial Code definition of goods, found in UCC [Section] 2-105."); *In re Erving Indus.*, 432 B.R. at 365 ("[T]his Court concludes (as have most, if not all, courts addressing the issue), that the meaning of goods under [Section] 503(b)(9) is primarily informed by the meaning of goods under Article 2 of the UCC.") (emphasis omitted); *In re Circuit City Stores*, 416 B.R. at 537 ("[T]he Court will adopt the UCC definition of 'goods' as the federal definition of goods for the purpose of interpreting [Section] 503(b)(9) of the Bankruptcy Code.  This ruling is consistent with the approach that has been taken by a number of other bankruptcy courts faced with the

---

[10] *Black's Law Dictionary* defines "goods" as "[t]angible or movable personal property other than money; esp[ecially], articles of trade or items of merchandise" and "[t]hings that have value, whether tangible or not." *Black's Law Dictionary* 714 (8th ed. 2004).

same question of interpreting the meaning of 'goods' under [Section] 503(b)(9).”); *In re*

*Pilgrim's Pride Corp.*, 421 B.R. at 237 (“The court concludes that the appropriate definition of

goods for the purpose of Code [Section] 503(b)(9) is that found in the 'model' UCC.”); *In re*

*Goody's Family Clothing*, 401 B.R. at 134 (“Use of the UCC Article 2's definition of 'goods' in

interpreting [S]ection 503(b)(9) is suggested in a leading treatise and has been adopted by

bankruptcy courts examining this issue.  Given the near unanimous nationwide adoption of

Article 2 of the UCC, the Court concludes that the term 'goods' in [S]ection 503(b)(9) conforms

with the meaning given in U.C.C. [Section] 2-105(1).”) (footnotes omitted).

 *C.  Factual Findings*

  In denying Hudson's Section 503(b)(9) claim, the Bankruptcy Court first found that

electricity did not fall within either potential UCC definition of goods – either a thing “which [is]

movable at the time of identification to the contract” or “an identified bulk of fungible goods.”

UCC §§ 2-105(1), (4).  Specifically, the Bankruptcy Court found that electricity is not “actually

movable at the time of identification” because it “disappears into use at th[e] moment” it reaches

the meter.  (MBR 14.)  Nor was it an identified bulk of fungible goods because it is “simply a

stream of electrical energy . . . identified . . . at the point of delivery.”  (*Id.*)

  Hudson asserts that these conclusions of the Bankruptcy Court are factually inaccurate.

With respect to electricity's movability at the time it is identified to the contract, Hudson argues

that it is in fact moveable at two distinct points – first, when it is purchased by Hudson and

released into the grid, (*see* Hudson Mem. 7-8), and second, when it is measured as it exits the

grid and passes through a meter at a customer's facility, (*see id.* at 10-11).  With respect to the

former, it argues that it made wholesale purchases from electricity generators (power plants) that

were specifically identifiable to its contract with the Reorganized Debtors.  (*See id.* at 7-8;

Hudson Reply Mem. at 7-8.)[11]  With respect to the latter, Hudson argues that it is incorrect to

say, as the Bankruptcy Court did, that electricity disappears into use at the moment it reaches the

meter; rather, electricity is actually used at the "precise moment . . . that [it] passes into the

device that it will power," although the temporal difference between the two is usually

imperceptible.  (Hudson Mem. 10.)  Batteries, which store electricity for later consumption, can

delay the time between metering and use, thus illustrating that electricity is still movable after it

passes through the meter.  (*See id.* at 11.)  Hudson further contends that electricity also qualifies

as an identified bulk of fungible goods, just like oil in a pipeline or grain in an elevator, because

any unit[12] of electricity is the same as any other unit, and the electricity that Hudson purchases

for a customer exists as an undivided share among an identified bulk of goods – that is, all of the

electricity in the power grid.  (*See id.* at 8-10.)  Finally, Hudson asserts that it was error for the

Bankruptcy Court to make factual conclusions about electricity's nature without an evidentiary

hearing.[13]  (*See* Hudson Mem. 24-25.)

---

[11] "Hudson Reply Mem." refers to the Reply Brief of Appellants Hudson Energy Services, [L.L.C.].  (Doc. 10.)

[12] Electricity may be measured in, among other units, kilowatt or megawatt hours.  The Reorganized Debtors argue that this is equivalent to charging by the hour, which is inconsistent with the sale of goods, (*see* RD Mem. 16), but this assertion is incorrect.  Kilowatt or megawatt hours measure the amount of electricity actually consumed by a user, (*see* Hudson Reply Mem. 6; *see also* MBR 13 (noting that electricity can also be measured by British thermal units, a unit with no time component)), by "integrate[ing] demand and duration," *In re Erving Indus.*, 432 B.R. at 363 n.13 (internal quotation marks omitted).  "[T]he use of a time element in measuring electricity consumption" is not inconsistent with a sale of goods but rather a way to charge consumers for their actual consumption of electricity.  *Id.*

[13] Hudson did not present evidence at the August 24, 2012 oral argument but proffered that it could present evidence about its business model in response to queries from the Bankruptcy Court.  (Bankr. Doc. 3999, at 16 (offering to present evidence on its relationship with Consolidated Edison); 47 (noting that Hudson has "not waived the right to present evidence" but could provide information "if the Court has issues on delivery points, specific points"); 50 ("[O]ur evidence would show, . . . that the way the Massachusetts system [in *Erving*] works is identical to [Hudson's] system.").)  Hudson's briefs before the Bankruptcy Court also reserved its right to present sworn testimony at any evidentiary hearing or conduct formal discovery on factual matters disputed by the Reorganized Debtors.  (*See* Memorandum of Law in Support of Motion of Hudson Energy Services, L.L.C. for Allowance of Administrative Claim Pursuant to 11 U.S.C. § 503(b)(9) ("Hudson Bankr. Mem."), (Bankr. Doc. 3728-3), at 1-2; Hudson Bankr. Reply Mem. 1-2, 5 n.1.)

In response, the Reorganized Debtors argue that Hudson's assertions have no merit. First, with respect to whether electricity is movable at the time of identification to the contract, the Reorganized Debtors contend that it is irrelevant if electricity is identifiable when it enters the power grid because Hudson makes no argument, nor could it, that the electricity it sold to them was identified to a contract for sale at the moment it entered the grid. (*See* RD Mem. 12-13.) Moreover, they assert that "once electricity has been 'identified' to a contract for sale by measurement at the meter, it has already been consumed by the end user" and ceases to be movable because it is "impossible for the consumer to return electricity to the provider after it has passed the meter point." (*Id.* (quoting *In re Pilgrim's Pride Corp.*, 421 B.R. at 239 (alterations omitted).) They further argue that the *de minimis* amount of electricity that could be stored in laptop and cell phone batteries does not undermine the Bankruptcy Court's conclusion that electricity is not movable at the time of identification to the contract. (*See id.* at 13 n.5.)[14] Regarding Hudson's argument that electricity also satisfies the UCC's definition of an identified bulk of fungible goods, the Reorganized Debtors assert that is unreasonable to consider the entire

---

[14] The Reorganized Debtors also argue that Hudson conceded at oral argument that its customers lacked the batteries necessary to store electricity in significant amounts. (RD Mem. 13 n.5.) That Hudson agreed that the Reorganized Debtors do not actually have the capacity to stockpile electricity, however, is irrelevant to the question of whether electricity itself fits within one of the UCC's definitions of "goods." Moreover, although the Bankruptcy Court agreed that the inability to stockpile electricity highlights that it is only identified "at the very moment of delivery because it is then used," the application of stockpiling rationale from Section 546 (authorizing sellers to reclaim goods) to Section 503(b)(9) has been persuasively rejected by other courts. *See In re Plastech Engineered Prods., Inc.*, 397 B.R. 828, 838 (Bankr. E.D. Mich. 2008) ("[T]here is no basis to import a requirement that the goods be reclaimable . . . [even though] Congress added [Section] 503(b)(9) to the Bankruptcy Code as part of [Section] 1227 of BAPCPA, entitled 'Reclamation.' . . . However, there is nothing in [Section] 503(b)(9) that requires a claimant to also be entitled to a reclamation right under [Section] 546. Section 546 does not limit or control in any way the rights that claimant has under [Section] 503(b)(9)."); *accord In re Erving Indus.*, 432 B.R. at 372-73 ("The Debtor posits an additional reason why electricity should not be considered a good under [Section] 503(b)(9) – namely, that the meaning of goods under [Section] 503(b)(9) should be interpreted in relation to the reclamation provisions under [Section] 546(c) and properly includes only goods that are capable of being 'stockpiled' by debtors and reclaimed by creditors. . . . The reference in [Section] 546(c)(2) to a reclaiming creditor's ability to assert a priority claim under [Section] 503(b)(9) does not limit the right of other creditors – those who sell goods not easily susceptible to reclamation – to assert priority claims under [Section] 503(b)(9). And the placement of both [Sections] 503(b)(9) and 546(c) in the 'Reclamation' section of the enacting public law does not persuade the Court that Congress had the type of limiting intent the Debtor would ascribe; the sheer placement of sections of the public law cannot trump the plain language of the Bankruptcy Code.") (emphasis omitted) (footnote omitted).

power grid as a "bulk" of goods, particularly where electricity in the grid is continually generated, transmitted, and consumed and not a "stable" source of electricity capable of identification.  (*See id.* at 14.)  Finally, the Reorganized Debtors contend that an evidentiary hearing is unnecessary for several reasons:  the Bankruptcy Court did not rely on its conclusions about the nature of electricity in denying Hudson's Motion; Hudson did not request an evidentiary hearing or make an offer of proof below;[15] and whether electricity is a good under Section 503(b)(9) is a question of law that can be resolved without taking evidence.  (*See id.* at 23-24.)

The Bankruptcy Court concluded that electricity was neither movable at the time of identification to the contract nor an identified bulk of fungible goods based on the parties' written submissions[16] and oral arguments.  Hudson argues here that it was error for the Bankruptcy Court to make its ruling based on factual assumptions about the delivery of electricity without giving Hudson the opportunity to disprove them.  (*See* Hudson Mem. 5, 24-25).  Because the factual record on which the Bankruptcy Court relied in making determinations about the nature of electricity consisted only of counsel's assertions – which were not

---

[15] This contention is without merit.  First, Local Bankruptcy Rule 9014-2(a) provides that "[t]he first scheduled hearing in a contested matter will not be an evidentiary hearing at which witnesses may testify, unless . . . the Court gives prior notice to the parties that such hearing will be an evidentiary hearing."  Thus, the Local Rule vests only the Bankruptcy Court with the authority to convert the first hearing into an evidentiary one, and Hudson is entitled to rely on these rules.  Moreover, Hudson preserved its right to present evidence.  (*See* note 13, *supra*.)

Further, the cases the Reorganized Debtors cite to support their contention that Hudson should have proffered evidence regarding whether electricity fits within the UCC's definition of goods are inapposite, (RD Mem. 23-24 (citing *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 151-52 (2d Cir. 2010) (affirming exclusion of testimony under Federal Rules of Evidence and noting that offer of proof required where significance of excluded evidence is not sufficiently obvious), *cert. denied*, 131 S. Ct. 1602 (2011); *Int'l Minerals & Res., S.A. v. Boma Res., Inc.*, 5 F. App'x 5, 9 (2d Cir. 2001) (summary order) (excluded evidence of party's recovery in separate action not preserved for appeal because no specific offer of proof at trial))), and an offer of proof was particularly unnecessary here in the absence of any reason to believe that the first proceeding would be an evidentiary hearing.

[16] Hudson's motion papers outline the deregulation of the New York electricity market and its business model as a non-utility supplier of electricity, as well as briefly summarize its arguments about electricity's tangibility, movability, and status as a commodity.  (Hudson Bankr. Mem. ¶¶ 1, 8-15, 27-30, 33, 36, 64.)  The Reorganized Debtors' brief discusses Hudson's business model and the applicability of the UCC definition of "goods" to electricity.  (RD Bankr. Obj. ¶¶ 6-7, 31-32.)

corroborated by sworn testimony or evidence and were disputed – its conclusions that electricity "disappears into use at th[e] moment" it reaches the meter and is "simply a stream of electrical energy . . . identified . . . at the point of delivery," (MBR 14), are insufficient for me to agree upon *de novo* or clearly erroneous review, *see Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 110 (2d Cir. 1998) (clear error where insufficient record basis for conclusion); *In re Milford Conn. Assocs., L.P.*, 404 B.R. 699, 706 (D. Conn. 2009) (abuse of discretion when decision based on clearly erroneous *or* insufficient factual finding); *cf. O'Rourke v. United States*, 587 F.3d 537, 540 (2d Cir. 2009) (per curiam) ("Findings of fact are not clearly erroneous if the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety.") (alterations and internal quotation marks omitted).  I simply need to know more about the delivery of electricity in this case to determine whether the electricity supplied by Hudson meets the UCC definition of goods either at the generator's meter, at the customer's, or within the grid.  Thus, I vacate the Bankruptcy Court's denial of Hudson's Section 503(b)(9) claim and remand to the Bankruptcy Court to conduct an evidentiary hearing.

I note that the Reorganized Debtors argue that an evidentiary hearing is unnecessary because the nature of electricity is a constant, or legislative fact – an "established truth[], fact[] or pronouncement[] that do[es] not change from case to case."  *United States v. Hernandez-Fundora*, 58 F.3d 802, 812 (2d Cir.), *cert. denied*, 115 S. Ct. 2288 (1995).  I disagree, for several reasons.  First, if – as Hudson argues and as the *Erving* case held – electricity passes through the meter at the customer's location and is at that moment identified and thereafter consumed, it seems to me that it would meet the UCC's definition of a good, for the reasons set forth by the *Erving* Court.  *See In re Erving Indus.*, 432 B.R. at 369-71.[17]  The record below does not allow

---

[17] Although both the parties and the Bankruptcy Court recognized that the claimants in *Erving* and Hudson have nearly identical business models, (*see* RD Bankr. Obj. ¶ 34; MBR 13; Bankr. Doc. 3999, at 50), the Bankruptcy

me to conclude that electricity works that way, but it also does not allow me to conclude that it

does not.  Thus, further factual development is necessary.

Second, while the physics of electricity may be constant, the instant case demonstrates

that the economic or business arrangements for its delivery are not.  Electricity can be provided

by integrated utilities that generate, sell, deliver and service, or by entities like Hudson, which in

today's deregulated market makes money simply by buying electricity from generators at a lower

price than that at which it sells to customers but is otherwise "hands-off," or by entities that are

somewhere in between.  Each may have different arrangements with others in the supply chain

from generator to consumer.  If Hudson's theory that electricity is always identified at the

customer's meter does not hold up, individualized assessment of these arrangements may be

necessary to determine whether the electricity sold in a given case is a "good."[18]  For example, it

may be that Hudson can prove that as a factual matter the electricity it supplied was identified to

Court reached the opposite conclusion as the *Erving* Court as to electricity's movability on substantially similar facts.  The Reorganized Debtors' attempts to distinguish *Erving* are unpersuasive.  (*See* RD Mem. 19-20.)  That the claimant and debtor in *Erving* used different contractual language than Hudson used here does not alter the nature of the electricity provided to the debtor there or the ultimate question of whether electricity can satisfy the UCC definition of "goods."  Moreover, the assertion that the "purchase" and "sale" language in a contract between the claimant and the debtor thus limits *Erving* to its facts is vastly overstated.  (*See id.* at 19.)  The *Erving* Court cited the contract language only as "further support[]" for the conclusion that the claimant was not providing services to the debtor, and the Section 503(b)(9) claim arose "solely from the sale of electricity."  *In re Erving Indus.*, 432 B.R. at 364.  The Reorganized Debtors' final argument that *Erving*'s findings on the nature of electricity show that electricity is more akin to a service than a good, *see id.* at 367 (electricity created by "applying a force to push electrons out of their orbits and cause them to 'flow' from atom to atom"), is equally overstated.  The *Erving* Court began its analysis of whether electricity satisfied the UCC definition of "goods" with a primer on electricity – at which point it explained how power plants create electricity (by pushing electrons out of their orbits) – before it ultimately found that because "electricity is movable at the time it is identified to the contract, electricity constitutes a good within the meaning of the UCC and [Section] 503(b)(9)," *id.* at 370.  And even if the Reorganized Debtors are correct that electricity also has a service component, it would not dispose of Hudson's claim entirely because Hudson would still be entitled to the value of any "goods" sold.  *See In re Pilgrim's Pride Corp.*, 421 B.R. at 237 & n.7 ("Congress, in [S]ection 503(b)(9), did not provide any basis for excluding from the section's scope goods delivered pursuant to a contract the primary thrust of which is provision of services. . . . To the extent that a claim, even if minimally, arises from delivery of goods, however, the claimant is entitled to administrative priority treatment.")  *In re Plastech*, 397 B.R. at 837 ("The only relevant determination under [Section] 503(b)(9) is the value of the 'goods' that were delivered, irrespective of whether the contract also called for the delivery and sale of services.")

[18] I recognize that the possibility of individualized fact-finding – regarding the nature of the claimant's business, how it physically provides the electricity, its arrangements with generators, etc. – is less desirable than a bright-line rule that electricity always or never is a "good."  But individualized analysis may be what the statute requires.

its contract with the Reorganized Debtors' predecessor when it passed through the generator's meter and entered the grid.  Accordingly, if after receiving evidence regarding Hudson's theory that electricity is identified to the contract at the customer's meter, the Bankruptcy Court is unpersuaded, it should go on to consider whether the arrangements here meet the UCC definition of a good in some other fashion.

Further, that courts analyzing the issue have reached varying conclusions on varying theories indicates that the nature of electricity – at least as interpreted by the courts for purposes of Section 503(b)(9) – is not an "established truth[] . . . that do[es] not change from case to case," *Hernandez-Fundora*, 58 F.3d at 812, which might obviate the need for an evidentiary hearing on the matter, *compare In re Pilgrim's Pride Corp.*, 421 B.R. at 239 & n.8 (electricity not a good because "[o]nce [it] has been 'identified' by measurement at the meter, it has already been consumed by the end user;" "[i]t [would be] impossible for the consumer to return electricity to the provider after it has passed the meter point;" and "[i]t is difficult to imagine how electricity to be delivered could be identified at all before transmission to the customer"); *In re Samaritan Alliance, LLC*, 2008 WL 2520107, at *4 (electricity not a good because "electricity provided is more properly characterized as a 'service'"), *with In re Grede Foundries*, 440 B.R. at 799-801 (affirming bankruptcy court holding that electricity a good because "an electric current is literally moving through the transmission network and continues to move until it is delivered to a customer *at the time* it is metered and consumed;" "metering satisfies the identification requirement of the UCC and the movement is sufficient to satisfy the movability requirement, even if it reaches the speed of light;" and "there is no principled distinction to be made" between electricity and natural gas or water, which are considered goods under the UCC definition) (emphasis in original) (internal quotation marks omitted); *In re S. Mont. Elec. Generation &*

*Transmission Coop., Inc.*, No. 11-BK-62031, 2013 WL 85162, at \*4-5 (Bankr. D. Mont. Jan. 8, 2013) (electricity a good for reasons stated in *In re Grede Foundries*); *In re Erving Indus.*, 432 B.R. at 370 (electricity a good because "[it] does not simply reach a customer's meter and simultaneously cease to exist" but rather "*passes through* the meter" so that "it is literally moving [at the time it is identified to the contract], and it remains movable for some period of time . . . through the customer's electrical wiring until it is ultimately put to use.") (emphasis in original). I cannot assess the accuracy of Hudson's assertions here regarding the Bankruptcy Court's purportedly factually incorrect findings given the conflicting case law and the lack of evidence in the record; whether Hudson's assertions about the nature of electricity will ultimately be borne out by the evidence must be determined through an evidentiary hearing.

Finally, the Reorganized Debtors also contend that no hearing is necessary because the Bankruptcy Court did not rely on its factual determinations about electricity in denying Hudson's Motion. (*See* RD Mem. 23.) I disagree. The Bankruptcy Court's findings about electricity – including that it is used at the moment it becomes identifiable at the customer's meter – formed the basis for its conclusion that "electricity does not fall within the UCC definition," (MBR 14), and thus the word "goods" in Section 503(b)(9) is "ambiguous when applied to electricity," (*id.* at 15). That conclusion as to ambiguity in turn caused the Bankruptcy Court to reach the legislative history, on the basis of which it determined to disallow the claim. (*See id.* at 16-17.) That the Bankruptcy Court relied on its factual findings about electricity is clear when considering the alternative. Had the Bankruptcy Court concluded instead that electricity is movable at the time of identification to the contract, or that electricity is an identified bulk of fungible goods, it would have concluded that electricity satisfied the UCC's definition of "goods," and accordingly would not have found Section 503(b)(9) ambiguous as applied to

electricity, and would have had no occasion to turn to its legislative history or the principle (with which this Court has no quarrel) that administrative priorities should be narrowly construed.  Its resort to legislative history and the *Howard* rule of narrow construction was made necessary only by the factual findings that the electricity at issue did not fit comfortably within the UCC definition.  Should those findings prove unwarranted on a fuller record, resort to those principles may be unnecessary.  *See In re Erving Indus.*, 432 B.R. at 373-74 ("[T]he Debtor presents an 'equitable' argument for the narrow construction of goods as used in [Section] 503(b)(9). . . premised on the Debtor's assumption that electricity does not easily fit within the meaning of goods under [Section] 503(b)(9). . . . But that lack of clarity is not present here [because] . . . this Court concludes that, using either the UCC definition or the definition urged by the Debtor, electricity easily falls within the definition.  The Court should not find an ambiguity where there is none or make policy decisions to limit the application of Bankruptcy Code provisions when the language of the statute is otherwise clear.") (emphasis omitted).

## III.  CONCLUSION

For the reasons stated above, the Order of the Bankruptcy Court is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.  The Clerk of the Court is respectfully directed to docket this decision and close the case.

**SO ORDERED.**

Dated:  September 16, 2013
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.